**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JAMES GAMBRELL,** *et al.*, <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **ISAAC FULWOOD, JR., Chairman of the United States Parole Commission,** *et al.*, <br><br> **Defendants.** | **Civil Action No. 11-626 (BJR)** <br><br> **MEMORANDUM OPINION** |

**DISMISSING CASE**

## I. INTRODUCTION

This case comes before the Court on Defendants' motion to dismiss.[1]  Plaintiffs are five individuals currently serving sentences in federal prison for various violations of the District of Columbia Code.  Plaintiffs bring suit against the Chairman and three Commissioners of the United States Parole Commission (collectively, "the Commission") under 42 U.S.C. § 1983.  Plaintiffs allege that the Commission violated their constitutional rights under the Due Process Clause, the *Ex Post Facto* Clause, and the First Amendment when it misapplied the District of Columbia parole guidelines and denied them parole.  For the following reasons, the Court grants Defendants' motion and dismisses this case.

---

[1]     Defendants move, in the alternative, for summary judgment.  The Court, however, finds dismissal appropriate and does not consider Defendants' alternative Rule 56 motion.

## II.  BACKGROUND

### A.  Parole Review Practices for D.C. Code Offenders

In 1997, Congress enacted the National Capital Revitalization and Self-Government

Improvement Act ("Revitalization Act"), which abolished the D.C. Parole Board ("the Board")

and directed the United States Parole Commission to conduct parole hearings for D.C. Code

offenders.  Pub. L. No. 105-33, § 11231, 111 Stat. 251.  The Revitalization Act further required

that the Commission conduct the parole hearings in accordance with the District of Columbia

parole laws and regulations.  *Id.* § 11231(a)-(c).

In 1987, the District of Columbia promulgated regulations ("1987 Regulations") designed

to "structure the exercise of the paroling authority's discretion," and promote "increased

consistency in parole release decisions and enhanced accountability of the Board."  Report on the

Development of the Paroling Policy Guidelines for the District of Columbia Board of Parole at

1.[2]  Specifically, these regulations made "explicit" six factors that the Commission had to

consider in reviewing the possibility of parole for a prisoner.  *Id.*  These factors, known as "pre-

incarceration factors," included: (1) prior convictions and adjudications; (2) prior commitments

of more than 30 days; (3) age at the commission of current offense; (4) recent commitment-free

period; (5) status of prisoner at time of current offense; and (6) history of heroin or opiate

dependence.  D.C. Mun. Regs. tit. 28, §§ 204.4-204.16.

The Commission combined these factors to arrive at a "Salient Factor Score" for each

prisoner, which in turn was used to assign a Total Point Score ("TPS").  The TPS took into

consideration the degree and type of risk that a prisoner posed to society prior to his

---

[2]      Despite quoting from this Report in their Complaint, Plaintiffs neglected to provide the Court
with a copy of this Report.  Having discovered that this Report was filed as an exhibit in the case
of *Sellmon v. Reilly*, Civ. No. 06-1650 (D.D.C. Dec. 14, 2008), ECF. No. 46, the Court takes
judicial notice and cites to the Report as appropriate.

incarceration, as well as his institutional adjustment and program achievement while incarcerated.  Report on the Development of the Paroling Policy Guidelines for the District of Columbia Board of Parole at 5-6.  The 1987 Regulations indicated that parole should be granted or denied depending on the TPS score.  *See* D.C. Mun. Regs. tit. 28, §§ 204.19, 204.21.

However, the 1987 Regulations allow the parole authority to deviate from the TPS score's mandated outcome for "unusual circumstances" that the parole authority specified in writing.  *Id.* § 204.22.  The 1987 Regulations provide ten factors that the Commission may use to justify such a departure.  Am. Compl., Ex. 1 at 32-34.  Relevant to this case, these factors include: (1) the current offense involved "ongoing criminal behavior"; (2) the offender had a history of "repetitive sophisticated criminal behavior"; (3) the offender had an unusually serious prior record of at least five felony convictions; (4) the offender's crime involved "unusual cruelty to victims"; and (5) other.  *Id.*  These factors are defined in the policy guidelines that the District of Columbia published in 1991 ("1991 Policy Guidelines") to supplement the 1987 Regulations (collectively, the "D.C. Guidelines").  Am. Compl., Ex. 2 at 6-9.

### B.  Plaintiffs

### 1.  James Gambrell

In January 1991, James Gambrell was convicted of committing second-degree murder while armed and was sentenced by the D.C. Superior Court to a prison term of 12 years to life.  Am. Compl. ¶ 41.  Gambrell's criminal record includes two prior convictions and two parole violations.  Defs.' Mot. to Dismiss ("Defs.' Mot."), Ex. 15 at 5.  robbery-rape in 1968, received parole in 1973, and while on parole committed a kidnapping and bank robbery by assault with a deadly weapon.  *Id.*  After serving a period of incarceration, Gambrell again received parole in

1985, only to violate parole yet again by committing the robbery-murder for which he currently

serves time.  *Id.*

In June 1998, the Board denied Gambrell parole based on his (1) previous failure under

community supervision, (2) ongoing and repetitive criminal history, (3) prior record of violence,

and (4) unusual cruelty to his victim.  Am. Compl. ¶ 43.

In December 1999, the Commission held its first parole hearing for Gambrell.  *Id.* ¶ 45.

Like the Board, the Commission departed from the D.C. Guidelines and denied him parole,

emphasizing that Gambrell's criminal history demonstrated an "unusually extensive or serious

prior record."  *Id.* ¶ 46.  The Commission further required Gambrell to wait three and a half years

before he could again request parole, a period of time referred to as a "set-off."  *Id.*

In July 2003 and July 2005, the Commission again denied parole based on Gambrell's

prior criminal convictions.  *Id.* ¶¶ 47-48.  However, the Commission lowered the set-off period

to three years in 2003 and to one year in 2006.  *Id.*

In July 2007,[3] the Commission denied Gambrell parole based on his prior criminal

convictions and increased his set-off to five years.  *Id.* ¶¶ 50-53.  The Commission reasoned that,

> [nineteen] years is simply not enough time for an individual to serve in a crime of
> this nature, and [the Commission] believe[s] that release at this time, or any time
> in the near future, would depreciate the seriousness of the offense behavior and
> promote disrespect for the law.

*Id.* ¶ 52.

In response, Gambrell filed a lawsuit challenging the July 2007 parole denial.  *Id.* ¶ 54.

In *Sellmon v. Reilly*, Judge Huvelle determined that the Commission denied parole by relying on

a reason that, although allowed under the federal parole guidelines, was not a "legitimate

---

[3]     The Commission held a hearing in July 2007, but its decision was issued in August 2007.  Am.
Compl. ¶¶ 50-53.  For ease, the Court will refer solely to the July 2007 date when referring to the
Commission's decision.

rationale" for departure under the D.C. Guidelines. *Sellmon v. Reilly*, 551 F. Supp. 2d 66, 97 (D.D.C. 2008) (citing 28 C.F.R. § 2.18).  Judge Huvelle concluded that the application of a new rule that was facially different and that created a risk of prolonging Gambrell's incarceration resulted in a violation of the *Ex Post Facto* Clause.  *Id.* at 97-98.  The *Sellmon* court directed the Commission to hold a new parole hearing for Gambrell and to correctly apply the D.C. Guidelines.  *Id.* at 99.

Pursuant to *Sellmon*, the Commission conducted a special reconsideration hearing for Gambrell in June 2008.  Am. Compl. ¶ 57.  Gambrell's TPS indicated that parole should be granted, and the Commission's Hearing Examiner recommended parole.  Defs.' Mot., Ex. 15 at 4.  However, the Commission's Executive Reviewer disagreed, reasoning that Gambrell remained a danger to the public safety due to his criminal history and his repeated parole violations.  *Id.*  In the end, the Commission denied Gambrell parole and issued a four-year set-off in July 2008.  *Id.* at 6.

### 2. Kenneth Easton

In July 1994, Easton was convicted of second-degree murder while armed and was sentenced to life in prison.  Defs.' Mot., Ex. 18.  According to a witness, the victim told Easton, "I don't have any money, I gave you all of it."  Defs.' Mot., Ex. 19 at 1.  The witness further testified that Easton reached into the victim's pocket before stepping back and shooting the victim at close range.  *Id.*

The Commission first denied Easton parole in April 2005.  Defs.' Mot. at 7.  Then in March 2010, even though Easton's TPS indicated that parole should be granted, the Commission again denied parole because his "offense involved exceptional cruelty to a victim."  *Id.*  In support of its decision, even though Easton had performed well and maintained good behavior,

the Commission considered Easton to be a danger to the community "because of the callous nature and unjustified killing of [his] victim."  Defs.' Mot., Ex. 23 at 3.

### 3.  Talib Shakir

In May 1995, Shakir was convicted of second-degree murder while armed and was sentenced to life in prison due to his involvement in a robbery-murder.  Defs.' Mot. at 8-9. Shakir's criminal record also includes two separate convictions in 1991 for voluntary manslaughter and for carrying a pistol without a license.  Defs.' Mot., Ex. 29 at 5.

After Shakir's initial parole hearing in March 2010, the Commission denied parole even though his TPS score indicated that parole should be granted.  *Id.* at 4.  The Commission reasoned that, if released, Shakir would likely violate parole because he had demonstrated "ongoing criminal behavior" by failing "to remain free of criminal activity over sustained periods of time."  *Id.* at 5.  The Commission noted that Shakir had been convicted of three separate crimes within a two-year period, including voluntary manslaughter, carrying a pistol without a license, and the robbery-murder for which he is currently in prison.  *Id.*  Moreover, the Commission observed that Shakir had committed the robbery-murder offense after he had already faced criminal responsibility for the death of another individual in his voluntary manslaughter conviction.  *Id.*  According to the Commission, this demonstrated that Shakir had been "undeterred by the intervention of the criminal justice system."  *Id.* at 4-5.

### 4.  James Dunn

Dunn was convicted of second-degree murder and sentenced to life in prison in November 1991.  Defs.' Mot. at 10.  Prior to this conviction, Dunn had been convicted for possession of ammunition, possession of an unregistered firearm, and federal drug charges. Defs.' Mot., Ex. 37 at 1.  Although Dunn's TPS score indicated that parole should be granted,

the Commission departed from the D.C. Guidelines and denied parole based on Dunn's "ongoing criminal behavior." *Id.* The Commission concluded that Dunn remained a danger to the community because the intervention of the criminal justice system in the past did not deter Dunn from further criminal activity. *Id.*

### 5.  William Carr

In November 1995, Carr was sentenced fifteen years to life in prison after being convicted of second-degree murder while armed and possession of a firearm for his participation in a robbery-murder offense. Defs.' Mot., Ex. 47. Two days prior to committing the robbery-murder, Carr was involved in a separate robbery-murder in Maryland. Defs.' Mot., Ex. 42. For the latter offense, Carr was convicted of first-degree murder and sentenced to life in prison by the Circuit Court for Prince George's County, Maryland. *Id.* Carr is currently serving concurrent life sentences for both convictions. *Id.*; Defs.' Mot. at 12.

At Carr's first parole hearing in July 2011, the Commission denied parole even though his TPS score indicated that parole should be granted. Defs.' Mot. 13. The Commission explained that the TPS score only accounted for the robbery-murder committed in the District of Columbia and not for the homicide committed in Maryland. Defs.' Mot., Ex. 46 at 1. Also, the Commission highlighted that the victims in both robbery-homicides were killed for no apparent reason. *Id.* In the Commission's view, Carr had showed a "wonton disregard for human life," and, thus, remained a high risk of future criminal activity. *Id.*

### C.  Procedural History

In this suit, Plaintiffs challenge the Commission's parole denials on three separate grounds. First, Plaintiffs allege that the Commission incorrectly applied the D.C. Guidelines during their parole proceedings in violation of their due process rights. Am. Compl. ¶ 105.

Additionally, Plaintiff Gambrell alleges that the Commission denied him parole and increased his set-off period in retaliation for his successful appeal in *Sellmon*, and argues that such vindictiveness constitutes a violation of his due process and first amendment rights.  *Id.* ¶¶ 99-102, 108-10.  Lastly, Plaintiffs allege that the Commission retroactively applied its own arbitrary interpretation of the D.C. Guidelines, thereby significantly increasing the risk of prolonging each of their incarceration periods and violating the *Ex Post Facto* Clause.  *Id.* ¶¶ 114-15.

Defendants move to dismiss for failure to state a claim under Rule 12(b)(6).  Defs.' Mot. at 1.  As Defendants' motion is ripe for consideration, the Court now turns to the applicable legal standard and the parties' arguments.

### III.  ANALYSIS

#### A.  Legal Standard for a Rule 12(b)(6) Motion to Dismiss

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true.  *In re Interbank Fund Corp. Sec. Litig.*, 668 F. Supp. 44, 47-48 (D.D.C. 2009) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  Moreover, ambiguities must be resolved in favor of the plaintiffs, giving them the benefit of every reasonable inference drawn from the well-pleaded facts and allegations in their complaint.  *See id.*

To survive a Rule 12(b)(6) motion, the complaint must plead sufficient facts, taken as true, to provide "plausible grounds" that discovery will reveal evidence to support the plaintiff's allegations.  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Aschroft v. Iqbal*, 556 U.S.

662, 678 (2009).  Moreover, "[a] pleading that offers 'labels and conclusions' or a formulaic

recitation of the elements of a cause of action will not do.  Nor does the complaint suffice if it

tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (citation omitted).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more

than a sheer possibility that defendant has acted unlawfully."  *Id.* (citation omitted).  For

example, "the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in

support of the pleaded claims is insufficient; the complaint must give the court reason to believe

that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."

*Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (citing *Twombly*,

550 U.S. at 570).  However, the court's function is not to weigh potential evidence that the

parties might present at a later stage, but to assess whether the proposed amended pleading alone

is legally sufficient to state a claim for which relief may be granted.  *Caribbean Broad. Sys., Ltd.*

*v. Cable &Wireless PLC*, 148 F.3d 1080, 1086 (D.C. Cir. 1998).  "Where a complaint pleads

facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between

possibility and plausibility of "entitlement to relief."'"  *Ashcroft*, 556 U.S. at 678 (citation

omitted).

Normally, the court's review of a Rule 12(b)(6) motion is limited to consideration of the

allegations contained in the operative complaint.  However, under certain circumstances, the

court may consider extraneous documents attached or referenced by any party.  For instance, the

Court may take judicial notice of agency rules and regulations, *Banner Health v. Sebelius*, 797 F.

Supp. 2d 97, 112 (D.D.C. 2011), and of publicly-filed records in our court and certain other

courts concerning matters that bear directly upon the disposition of the case at hand, 5B Charles

Alan Wright et al., *Federal Practice and Procedure* § 1357, at 376 (3d ed. 2004).  Further, the

court may consider documents attached to the complaint, *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006), or referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.  *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).

### B.  The Court Dismisses Plaintiffs' Claims That the Commission Violated Their Due Process Rights by Acting Arbitrarily

Plaintiffs argue that the Commission applied the D.C. Guidelines arbitrarily because the record contained no rational basis to support the Commission's decisions to deny each of them parole.  Pls.' Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n") at 19.  Plaintiffs contend that such an arbitrary parole review procedure denied Plaintiffs a fair review process and, thus, violated their due process rights.[4]  *Id.*

Defendants maintain that the Commission afforded Plaintiffs the procedural protections to which prisoners are entitled under the Due Process Clause: an opportunity to be heard and an explanation for the denial.  Defs.' Mot. at 18.  Defendants further insist that the Commission's decisions in this case were not so arbitrary as to constitute a due process violation.  Defs.' Reply in Supp. of Mot. to Dismiss ("Defs.' Reply") at 4; Defs.' Mot. at 30.

A parole review procedure complies with the Due Process Clause when the prisoner is afforded an opportunity to be heard and, if denied parole, is provided a statement of the reasons for the denial.  *Swarthout v. Cooke*, 131 S. Ct. 859, 862 (2011) (citing *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 15-16 (1979)).  Nevertheless, the D.C. Circuit has observed, in dictum, that arbitrary governmental conduct may in itself violate

---

[4]     Plaintiffs concede they do not have a constitutionally-protected liberty interest in parole under the 1987 D.C. Guidelines.  Pls.' Opp'n at 19; *see also Ellis v. Dist. of Columbia*, 84 F.3d 1413, 1415 (D.C. Cir. 1996) (explaining that the parole statute in Washington D.C. "create[s] no 'expectancy of release' entitling a prisoner to due process protections").

the Due Process Clause. *Blair-Bey v. Quick*, 151 F.3d 1036, 1048 n.11 (D.C. Cir. 1998) (noting that the D.C. Board of Parole's reliance on plaintiff's juvenile record to support a parole denial decision did not meet "so high a standard" because "such reliance [was not] so irrational or arbitrary as to violate the due process clause"); *see also Madley v. U.S. Parole Comm'n*, 278 F.3d 1306, 1311 (D.C. Cir. 2002) (holding that the Commission's conduct in denying plaintiff parole was not arbitrary enough to violate the Due Process Clause even though the Commission did not correctly apply the parole procedure when it relied on a previously dismissed charge); *Bethea v. Bureau of Prisons*, Civ. No. 04-2269, 2005 WL 3244195, at *3 (D.D.C. Nov. 30, 2005) (concluding that the findings supporting the Commission's decision to revoke plaintiff's parole were not so arbitrary as to violate plaintiff's due process rights because the findings were adequately supported).  While the D.C. Circuit has not explained what constitutes arbitrary governmental conduct specifically in the context of parole release decisions, the D.C. Circuit declared, in the context of parole revocation, that the Commission's decision must not be "either totally lacking in evidentiary support or [] so irrational as to be fundamentally unfair." *Duckett v. Quick*, 282 F.3d 844, 847 (D.C. Cir. 2002) (citing *Douglas v. Buder*, 412 U.S. 430, 432 (1973)).

Like the Board it replaced, the Commission has substantial discretion in parole decisions. *See* Pub. L. No. 105-33, § 11231(a)(1), 111 Stat. 251 (transferring to the Commission the "exclusive authority to amend or supplement any regulation interpreting or implementing the parole laws of the District of Columbia with respect to felons, provided that the Commission adheres to [statutory] rulemaking procedures"); *see also Ellis v. Dist. of Columbia*, 84 F.3d 1413, 1419 (D.C. Cir. 1996) (declaring that the D.C. Guidelines do not compel the Board to grant parole, as parole is never required even if all prerequisites are satisfied) (citing *McRae v. Hyman*,

667 A.2d 1356, 1357 (D.C. 1995)).  The Commission also has broad discretion to depart from

the D.C. Guidelines, and to do so the Commission need only "specify in writing those factors

which it used to depart" from the D.C. Guidelines, including the factors listed in Appendices 2-1

and 2-2 of the 1987 Regulations or "Other" reasons outside the D.C. Guidelines.  D.C. Mun.

Regs. tit. 28, § 204.22; *Ellis*, 84 F.3d at 1419 -20.

       As explained below, the Commission afforded each Plaintiff an opportunity to be heard

and supported each denial decision with an explanation in writing.  As such, the Commission

satisfied the due process requirements that the Supreme Court laid out in *Greenholtz*.  *See*

*Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 15-16

(1979).  In addition, none of the Commission's decisions to deny Plaintiffs parole violated the

Due Process Clause due to their arbitrariness.

### 1.  James Gambrell

       After a parole hearing in June 2008, the Commission denied Gambrell parole because of

his "ongoing criminal behavior."  Defs.' Mot., Ex. 15 at 4.  The 1991 Policy Guidelines define

"ongoing criminal behavior" as, *inter alia*, "[a] criminal record where the current conviction is at

least the third (3rd) conviction for substantially similar offenses . . . ."  Am. Compl., Ex. 2 at 6.

The Commission indicated that the murder for which Gambrell currently serves time "marks his

third conviction for a substantially similar offense," referring to the fact that Gambrell's two

prior convictions involved armed robbery.  Defs.' Mot., Ex. 15 at 4-5.  The Commission also

noted that Gambrell had received parole during his previous two terms in prison but violated

parole each time by committing a new assaultive crime.  *Id.* at 5-6.  For these reasons, the

Commission concluded that Gambrell remained a danger to the public safety and was unsuitable

for release.  *Id.* at 4, 6.

In deciding Gambrell's case, the Commission satisfied the *Greenholtz* standard, as it allowed Gambrell an opportunity to be heard at a parole hearing and supported the denial with a written explanation of its reasons.  Upon reviewing the Commission's reasoning, there is no basis to conclude that the parole denial was so arbitrary or irrational as to deprive Gambrell of his due process rights.  Therefore, the Court dismisses Gambrell's due process claim based on the Commission's alleged arbitrary application of the D.C. Guidelines.

## 2.  Kenneth Easton

After a parole hearing, the Commission determined that Easton's offense demonstrated "exceptional cruelty to the victim."  Defs.' Mot., Ex. 25 at 4.  The 1991 Policy Guidelines allow a departure when the "instant offense involved unusual cruelty to victims," including offenses that involve "[p]hysical, mental or emotional abuse beyond the degree needed to sustain a conviction on the instant offense . . . ."  Am. Compl., Ex. 2 at 7.  The Commission explained that Easton set out to rob the victim and succeeded in doing so, yet Easton still shot the unarmed victim from close range, even after the victim had expressed that he had given Easton everything he had.  Defs.' Mot., Ex. 25 at 4.  In the Commission's view, by murdering the victim after having successfully robbed him, Easton "demonstrated extreme callousness" and, thus, remained a danger to the public safety.  *Id.*

Easton argues that the Commission violated his due process rights because it erred in applying the factor "instant offense involved unusual cruelty to victims."  Am. Compl. ¶¶ 70, 105.  Specifically, Easton contends that the "instant offense" of which Easton was convicted was murder, not robbery, and Easton was not unusually cruel in murdering the victim.  *Id.* ¶ 70.  According to Easton, although he "shot the victim, he did not abuse [him] beyond the shooting."  *Id.*  Easton insists that the Commission misapplied the "unusual cruelty to victims" factor.  *Id.*

As a threshold matter, Easton received an opportunity to be heard at his parole hearing, and the Commission explained its reasons for the parole denial.  *Greenholtz*'s due process requirements are thus satisfied.  Additionally, assuming *arguendo* that the Commission misapplied the factor of "unusual cruelty to victims," the Commission still retains broad discretion to depart from the Guidelines by relying on other reasons outside the enumerated factors.  *Ellis v. Dist. of Columbia*, 84 F.3d 1413, 1419 (D.C. Cir. 1996).  Given such vast discretion, the Court cannot conclude that the Commission acted arbitrarily when it denied parole by explaining that Easton's actions showed he remains a danger to the public safety.  *See id.* at 1419.  Nor was the reasoning behind the Commission's decision so irrational or arbitrary as to violate Easton's due process rights.  Given the foregoing, Easton's due process claim is dismissed.

### 3. Talib Shakir

The Commission denied Shakir parole because of his "ongoing criminal behavior." Defs.' Mot., Ex. 29 at 5.  The 1991 Policy Guidelines define "ongoing criminal behavior" as, *inter alia*, "poor community adjustment as evidenced by failure to remain free of criminal activity over sustained periods of time."  Am. Compl., Ex. 2 at 6.  According to the Commission, Shakir's three separate convictions—carrying a pistol without a license, voluntary manslaughter and second degree murder—over a two-year period showed a failure "to remain free from criminal activity over sustained periods of time."  Defs.' Mot., Ex. 29 at 5.  The Commission also pointed that Shakir's commission of a robbery-murder even after facing criminal responsibility for the death of another individual (*i.e.*, his voluntary manslaughter conviction) demonstrated that Shakir had been previously "undeterred by the intervention of the criminal

justice system." *Id.* Therefore, in the Commission's judgment, if released, there remained a reasonable risk that Shakir would violate parole and endanger the public safety. *Id.*

Shakir argues that the Commission violated his due process rights by incorrectly applying the factor "ongoing criminal behavior." Pls.' Opp'n at 26. According to Shakir, the time over which the three crimes occurred, approximately 1 year and 11 months, is too short a time to constitute a "sustained period[] of time" under the 1991 Policy Guidelines. *Id.*

Shakir was provided the opportunity to be heard at a parole hearing, and the Commission explained its denial rationale. As such, Shakir received the process that is due under the circumstances according to *Greenholtz.* Also, since the Commission has the discretion to deny parole by relying on reasons outside the D.C. Guidelines under the "Other" category, *Ellis*, 84 F.3d at 1419, even if Shakir could prove that the Commission misinterpreted the phrase "sustained period[] of time," this alone would not amount to arbitrary action in violation of the Due Process Clause. Moreover, the Commission's reasoning in support of Shakir's parole denial was not so arbitrary or irrational as to violate the prisoner's due process rights. Accordingly, Shakir's due process claim is dismissed.

### 4. James Dunn

After his parole hearing, the Commission denied Dunn parole because his four separate convictions—possession of ammunition, possession of an unregistered firearm, federal drug charges, and second degree murder—demonstrated "ongoing criminal behavior." Defs.' Mot., Ex. 37 at 1. "Ongoing criminal behavior" is defined, *inter alia*, as "poor community adjustment as evidenced by failure to remain free of criminal activity over sustained periods of time." Am. Compl., Ex. 2 at 6. In the Commission's view, since the intervention of the criminal justice

system did not previously deter Dunn from continuing a pattern of criminality, Dunn remained a danger to the public safety.  Defs.' Mot., Ex. 37 at 1.

Like his co-Plaintiff Shakir, Dunn argues that the Commission incorrectly applied the factor "ongoing criminal behavior."  Am. Compl. ¶¶ 84-89.  More specifically, Dunn contends that the time over which Dunn's crimes were committed—approximately two and a half years—does not constitute a "sustained period[] of time," and, therefore, he did not exhibit "ongoing criminal behavior." [5]  Pls.' Opp'n at 27.

In Dunn's case, the Commission's review procedure satisfied the due process requirements under *Greenholtz*: Dunn had the opportunity to be heard, and the Commission explained the reasons for its decision.  Dunn cannot establish that the Commission acted arbitrarily simply by arguing that two and a half years is too short a period to constitute a "sustained period[] of time."  Even if Dunn could show that the Commission misinterpreted the meaning of a "sustained period of time," this is not enough to constitute arbitrary action since the Commission has broad discretion to depart from the D.C. Guidelines.  *See Ellis*, 84 F.3d at 1419.  Moreover, the reasoning behind the Commission's decision to deny Dunn parole was not so irrational or arbitrary as to violate the Due Process Clause.  Therefore, the Court dismisses Dunn's due process claim.

### 5.  William Carr

After a parole hearing, the Commission denied Carr parole because it determined that he remained a danger to the public safety.  Defs.' Mot., Ex. 46 at 1.  According to the Commission, Carr's involvement in two robbery-homicides in which the victims were killed for no apparent

---

[5]       Additionally, Dunn contends that two of his convictions—both weapon charges—occurred while he was a juvenile.  Am. Compl. ¶¶ 86-88.  In Dunn's view, considering juvenile convictions during parole evaluations is unjust and against "the spirit of the D.C. Parole Guidelines."  *Id.* Plaintiff has provided no legal support for the notion that the Commission's consideration of juvenile crimes makes the Commission's decision irrational or arbitrary.

reason demonstrated a "wonton disregard for human life," which, in turn, suggested a high risk

of future criminal activity. *Id.* Carr argues that the Commission violated his due process rights

because it did not support its decision to deny parole with any of the enumerated factors in the

D.C. Guidelines. Am. Compl. ¶ 93.

Carr received an opportunity to be heard, and the Commission explained the rationale

behind its denial decision, thereby satisfying the *Greenholtz* due process requirements. As stated

above, the Commission has broad discretion to depart from the D.C. Guidelines by relying on

reasons "Other" than the enumerated factors. *Ellis*, 84 F.3d at 1419. Therefore, that the

Commission did not explicitly rely on an enumerated pre-incarceration factor does not mean that

its decision was arbitrary or inadequately supported. Lastly, the Commission's decision was not

so irrational or arbitrary as to violate the prisoner's due process rights. Given the foregoing, the

Court dismisses Carr's due process claim.

### C. The Court Dismisses Gambrell's Claim that the Commission Violated His Due Process Rights by Acting with Vindictiveness

Plaintiff Gambrell alleges that the Commission violated his due process rights when it

imposed a "harsher sentence" on him following his successful challenge of the Commission's

2007 parole decision in *Sellmon v. Reilly.* Am. Compl. ¶¶ 99-101. In support of this due process

claim, Gambrell argues that he is entitled to a presumption that the Commission acted with

vindictiveness in July 2008 when it imposed a four year set-off. *Id.* ¶ 100.

Defendants argue that Gambrell did not receive a harsher punishment in July 2008, as

compared with the Commission's decision at the 2007 parole hearing, *i.e.* the parole hearing that

Gambrell challenged in *Sellmon.* Defs.' Mot. at 34. In response, Plaintiff Gambrell argues that

the proper comparison is between the Commission's decisions in the 2008 and the 2006 parole

hearings because *Sellmon* invalidated the Commission's decision in 2007. Pls.' Opp'n at 23.

In its traditional context, a presumption of vindictiveness arises "whenever a judge imposes a more severe sentence upon a [criminal] defendant after a new trial" and the reasons for doing so do not "affirmatively appear." *North Carolina v. Pearce*, 395 U.S. 711, 725-26 (1969) (holding that the "[d]ue process of law . . . requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial"); *see also Maddox v. Elzie*, 238 F.3d 437, 446 (D.C. Cir. 2001).  The Supreme Court has limited the presumption of vindictiveness to those circumstances when there is a "reasonable likelihood" that the harsher sentence "is the product of actual vindictiveness on the part of the sentencing authority." *Alabama v. Smith*, 490 U.S. 794, 799 (1989).  In the absence of such reasonable likelihood, the criminal defendant retains the burden to prove actual vindictiveness. *Id.*

Several courts have extended the doctrine of the presumption of vindictiveness to the context of parole determinations.  *See, e.g.*, *Bono v. Benov*, 197 F.3d 409, 416-17 (9th Cir. 1999); *Kindred v. Spears*, 894 F.2d 1477, 1479 (5th Cir. 1990); *Marshall v. Lansing*, 839 F.2d 933, 947 (3d Cir. 1988); *Hammond v. Dist. of Columbia Bd. of Parole*, 756 A.2d 896, 899 (D.C. 2000).  In evaluating whether a parole authority acted with vindictiveness after a prisoner successfully challenged a prior parole decision, courts compare (a) the punishment that the prisoner initially challenged, with (b) the more severe punishment imposed after the challenged decision.  *See, e.g., Bono,* 197 F.3d at 416-17; *Marshall*, 839 F.2d at 947-48; *Hammond*, 756 A.2d at 899.  Accordingly, to determine if a presumption of vindictiveness arises that would support Gambrell's due process claim, the Court compares the 2007 decision that Gambrell initially challenged in *Sellmon*, with the 2008 decision that Gambrell now alleges was a more severe punishment in retaliation for his participation as a plaintiff in *Sellmon*.

In Gambrell's July 2007 hearing the Commission denied him parole and imposed a five-year set-off, scheduling his next parole hearing for July 2012.  Am. Compl. ¶ 53.  In 2008, after *Sellmon* reversed the Commission's 2007 decision, the Commission again denied Gambrell parole and issued a four-year set-off, maintaining the next parole hearing scheduled for July 2012.  *Id.* ¶¶ 59-60.  As Gambrell's next parole hearing remained scheduled for July 2012, the Commission did not impose a harsher sanction on Gambrell.  Without a harsher sanction, Gambrell cannot establish a presumption of vindictiveness.  *See North Carolina v. Pearce*, 395 U.S. 711, 725-26 (1969).  Nor does Gambrell attempt to prove actual vindictiveness.  Therefore, Gambrell's due process claim based on vindictiveness fails and is hereby dismissed.

### D.  The Court Dismisses Gambrell's First Amendment Retaliation Claim

Similar to his vindictiveness claim, Plaintiff Gambrell alleges that the Commission retaliated against him by imposing a harsher sentence following the *Sellmon* decision, and thereby violated his First Amendment right to seek redress of grievances in court.  Am. Compl. ¶¶ 63-64.  Gambrell contends that in 2008 the Commission increased his set-off period in retaliation for his successful challenge in *Sellmon* of the Commission's 2007 decision.  *Id.* ¶ 64.

Defendants move to dismiss Gambrell's First Amendment retaliation claim, arguing that Gambrell failed to sufficiently plead specific facts as required under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Defs.' Mot. at 38.  More specifically, Defendants argue that Gambrell did not allege facts sufficient to show that the Commission's decision to deny Gambrell parole and issue a four-year set-off was "motivated by a desire to punish Gambrell for filing suit."  *Id.*  In response, Gambrell argues that he had properly pleaded his retaliation claim by (1) noting that he received progressively shorter set-offs prior to the 2007 hearing, (2) alleging that the Commission increased his punishment in 2008, and (3) pointing to the lack of any intervening facts or

evidence that justified an increased punishment between the 2006 and 2008 hearings, other than the successful challenge in *Sellmon*.  Pls.' Opp'n at 29-30.

In the prison context, a First Amendment retaliation claim entails five elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *see also Anderson-Bey v. Dist. of Columbia*, 466 F. Supp. 2d 51, 65 (D.D.C. 2006).

Assuming *arguendo* that Gambrell's alleged increased punishment constitutes an adverse action under the first element, Gambrell still cannot establish a First Amendment retaliation claim because he fails to plead sufficient facts to support the element of causality.  Gambrell only pleads that the Commission increased his punishment after *Sellmon* and that "no new facts or evidence arose between the [Commission's] 2006 decision and the 2008 decision" that justified increasing the set-off period.  Pls.' Opp'n at 29-30.  However, Gambrell's entire theory of causality rests on the incorrect premise that the Commission increased his punishment in 2008, after his successful challenge in *Sellmon*.  As already noted, the Commission did not increase Gambrell's punishment in 2008.  *See supra* Part III.C.  Gambrell inappropriately disregards that the Commission increased his set-off in 2007, *before* his successful challenge in *Sellmon*.  In the 2008 hearing, after *Sellmon*, the Commission gave Gambrell the same sanction that it had given him during his 2007 parole hearing, *i.e.*, denial of parole and a set-off date in July 2012.  Am. Compl. ¶¶ 63-64.

Since Plaintiff Gambrell's basic premise that the Commission increased his punishment in 2008 is erroneous, Gambrell has pleaded no facts to support that the successful challenge in

*Sellmon* caused the Commission's decision to deny him parole and maintain his set-off in July

2012.  In other words, Gambrell's allegation that there have been no intervening facts or

evidence to justify an increased punishment between the 2006 and 2008 hearings is irrelevant to

showing causality.  Having failed to sufficiently plead facts to support the element of causality,

Gambrell cannot prevail on his First Amendment action.  Accordingly, the Court dismisses

Gambrell's First Amendment retaliation claim.

### E.  The Court Dismisses Plaintiffs' *Ex Post Facto* Claims

Defendants argue that Plaintiffs' *ex post facto* claims should be dismissed because

Plaintiffs have failed to demonstrate that the Commission's conduct significantly increased the

risk of prolonging their incarceration.  Defs.' Mot. at 20.  Plaintiffs contend that, in denying each

of them parole, the Commission applied its own arbitrary interpretation of the D.C. Guidelines

which differs from how the D.C. Parole Board had been interpreting the D.C. Guidelines.  Am.

Compl. ¶ 114.  Specifically, Plaintiffs charge that the Commission "broadened the scope of the

parole inquiry, and used factors the [D.C. Parole Board] would not have used."  Am. Compl. ¶¶

115-19.  In Plaintiffs view, this approach significantly increased the risk of prolonging their

incarceration, in violation of the *Ex Post Facto* Clause.  *Id.*

"The Constitution forbids the passage of *ex post facto* laws, a category that includes

'every law that changes the punishment, and inflicts a greater punishment, than the law annexed

to the crime, when committed.'"  *Peugh v. United States*, 2013 U.S. LEXIS 4359, at *6 (June 10,

2013) (quoting *Calder v.* Bull, 3 U.S. 386, 390 (1798) (alterations omitted)).  The purpose of the

*Ex Post Facto* Clause is "to assure that legislative Acts give fair warning of their effect and

permit individuals to rely on their meaning until explicitly changed."  *Weaver v. Graham*, 450

U.S. 24, 28-29 (1981).  The retroactive application of parole guidelines may violate the *Ex Post*

*Facto* Clause if it "create[s] a significant risk of increasing [the inmate's] punishment." *Garner v. Jones*, 529 U.S. 244, 255 (2000). Whether the retroactive application of a parole regime violates the *Ex Post Facto* Clause requires a "searching comparison" of two parole regimes. *Sellmon v. Reilly*, 551 F. Supp. 2d 66, 84 (D.D.C. 2008) (quoting *Fletcher v. Reilly*, 433 F.3d 867, 879 (D.C. Cir. 2006)). A prisoner can demonstrate a risk of increased punishment by showing a facial difference between the earlier and the later rules. *Fletcher*, 433 F.3d at 877. In the absence of a facial difference, a prisoner can demonstrate that, as applied to the prisoner's case, the new rule's "practical effect" is to substantially increase the risk of prolonging the prisoner's incarceration. *Sellmon*, 551 F. Supp. 2d at 91 (citing *Fletcher*, 433 F.3d at 877).

Here, there is no second parole regime from which the Court can conduct a "searching comparison" in order to determine whether there is an *ex post facto* violation. Plaintiffs do not offer any proof and do not allege that the Commission applied any other specific set of guidelines that is different from the guidelines previously applied by the D.C Parole Board. Thus, it appears that the Commission applied the same D.C. Guidelines previously published and applied by the D.C. Parole Board. Moreover, for each Plaintiff, the Commission used the scoring system and relied on the appropriate factors to explain its parole decisions, as required under the D.C. Guidelines. *See* Defs.' Mot., Ex. 15, 19, 29, 37, 46.

Plaintiffs' argument dwindles to this: when compared to the D.C. Parole Board's interpretation of the D.C. Guidelines, the Commission's interpretation of the same D.C. Guidelines caused a significant risk of prolonging their incarceration. Am. Compl. ¶ 114. However, the fact that a parole authority may interpret the parole guidelines in a stricter fashion than a prior parole authority is not an *ex post facto* violation, as long as the parole authority acts within its discretion. *See Foster v. Booker*, 595 F.3d 353, 362-63 (6th Cir. 2010) ("[T]here is no

ex post facto violation if a lenient judge is replaced by a strict one . . . .  Without some legal change other than a difference in the proper exercise of discretion . . . [there is] no ex post facto-protected interest in the more lenient sentence, as long as the more severe sentence was within the range available to the sentencing judge at the time of the crime."); *see also Garner*, 529 U.S. at 259 (Scalia, J., concurring) ("[T]he Ex Post Facto Clause gives respondent no cause to complain that the Board in place at the time of his offense has been replaced by a new, tough-on-crime Board that is much more parsimonious with parole.").  Moreover, the Revitalization Act itself vests the Commission with the "exclusive authority to amend or supplement any regulation interpreting or implementing the parole laws of the District of Columbia with respect to felons, provided that the Commission adheres to [statutory] rulemaking procedures."  Pub. L. No. 105-33, § 11231(a)(1), 111 Stat. 251.

As previously noted, the Commission has vast discretion in parole decisions and it arguably utilized that discretion in denying parole to each of the Plaintiffs.  *See supra* Part III.B. Indeed, the Commission's discretion is such that it may even deny parole for a reason outside of the enumerated pre-discretion factors.  *Id.*  Accordingly, even if Plaintiffs were able to show that the Commission interpreted the factors more broadly or harshly than the D.C. Parole Board, this would not amount to an *ex post facto* violation.[6]  *See Foster v. Booker*, 595 F.3d 353, 362-63 (6th Cir. 2010).  Given the foregoing, the Court dismisses Plaintiffs' claims based on *ex post facto* violations.

---

[6]    Plaintiff Carr specifically argues that, in its decision to deny Carr parole, the Commission did not identify any enumerated factors that justify departure from the D.C. Guidelines.  Am. Compl. ¶¶ 93, 119.  In Carr's view, the Commission's reliance on reasons outside the D.C. Guidelines shows that the Commission applied its own arbitrary guidelines, in violation of the *Ex Post Facto* Clause.  *Id.*  However, as discussed above, the Commission holds wide discretion to rely on reasons outside of the factors listed in the D.C. Guidelines under the catch-all category of "Other."  *Ellis v. Dist. of Columbia*, 84 F.3d 1413, 1419 (D.C. Cir. 1996).  Given this discretion, the Court finds that the Commission did not abuse its discretion when it denied Carr parole based on reasons not specifically listed as factors under the D.C. Guidelines.

## IV.  CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** that Defendants' motion to dismiss is **GRANTED**.  An Order will be issued simultaneously and contemporaneously with this memorandum opinion.

June 18, 2013

_____

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE